**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emanuel Carreno, <br> on behalf of his minor son, <br> G. Carreno, <br>    Plaintiff, <br> vs. <br> Michael J. Astrue <br> Commissioner of Social Security, <br>    Defendant. | No. CV 07-1678-PHX-SMM <br><br> **ORDER** |

## I. BACKGROUND

Currently before the Court is Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment, both filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. After careful consideration of the motions and the arguments set forth therein, the Court finds the following.

### A. Procedural History

On June 30, 2005, Emanuel Carreno ("Mr. Carreno") filed an application for Supplemental Security Income Benefits on behalf of his minor son, G. Carreno[1] (Date of Birth: 7/23/97). The application was denied on September 23, 2005, and upon

---

[1] Mr. Carreno's son will be referred to as "G." throughout this order, as he is a minor.

1  reconsideration, denied again on March 6, 2006. Following a hearing on November 13, 2006, an Administrative Law Judge ("ALJ") found that G. had a "severe" learning and conduct disorder. However, the ALJ affirmed the denial of benefits, finding that G.'s impairment did not "functionally equal" the level of impairment established by the regulation for determining functional equivalence of a disability in children, 20 C.F.R. § 416.926a. Plaintiff filed the instant Motion for Summary Judgment to appeal the ALJ's decision to this Court. Defendant thereafter filed a Cross-Motion for Summary Judgment.

**B.  Relevant Background Regarding ALJ's Decision**

**1.  Academic History and Teacher Evaluations**

However, several weeks into second grade, on December 7, 2004, G. was held back to repeat the first grade (R. at 140) because his father and teachers had determined that he was not adequately completing his school work. (R. at 266-267.) At the time of the ALJ's decision on January 31, 2007, G. was in the third grade. (R. at 24.)

On August 25, 2005, G.'s first special education teacher, Ms. Pretianger, completed a Teacher Questionnaire evaluating G. as a student. (R. at 129-136.) Having only worked with G. for three weeks, Ms. Pretianger noticed that while G. was "well behaved," he "has difficulty reading and comprehending written passages." (R. at 130.) She noted that G.'s attempts to do this independently were "not always successful." (R. at 129.) Ms. Pretianger did not note any problem with G's ability to attend to and complete tasks. (R. at 131.)

On January 18, 2006, G.'s new special education teacher, Ms. Tundle, completed the same Teacher Questionnaire. (R. at 121-128.) Ms. Tundle reported that G. had an "obvious problem" in the domain of "Acquiring and Using Information." (R. at 122.) Ms. Tundle noted that G. went to the "resource room" on a daily basis for help with his needs. (*Id.*). She also emphasized that the help G. received from his peer tutors allowed him to "complete his assignments successfully." (*Id.*) Ms. Tundle also reported that G. had a problem attending to and completing tasks on a daily basis. (R. at 123.) She noted that he "needs constant encouragement to complete a task along with repeated verbal instruction." (*Id.*)

On November 2, 2006, G.'s teacher, Ms. Turman, completed the Teacher Questionnaire. (R. at 113-120.) Ms. Turman reported that within the domain of "Acquiring and Using Information," G. had a problem in 9 out of 10 areas. (R. at 114.) Among these areas, Ms. Turman noted that G. had a "very serious problem" expressing ideas in written form. (*Id.*) Further, G. had a "serious problem" understanding vocabulary, reading and comprehending written material, and learning new material. (*Id.*) Within the domain of "Attending and Completing Tasks," Ms. Turman reported that G. had a problem in 9 of 13 areas. (R. at 115.) She noted a "serious problem" with G.'s ability to complete class and homework assignments, to do so accurately without careless mistakes, and to work without distracting himself or others. (*Id.*) Ms. Turman also noted an "obvious problem" with G.'s ability to focus long enough to finish assignments and to refocus when necessary. (*Id.*) Additionally, G. had an "obvious problem" changing activities and working at a reasonable pace in order to finish an activity in a timely manner. (*Id.*)

**2. Witness Statements**

G.'s father, Mr. Carreno, testified that G. has behavioral and learning problems. (R. at 266-273.) Mr. Carreno further reported that G. does very poorly in school, and G.'s teachers report to Mr. Carreno that G. is forgetful, hyperactive, and "bothers other kids in class." (R. at 269-270.) Mr. Carreno also described G. as having behavioral problems at home as evidenced by G. disobeying and forgetting to do things that Mr. Carreno asks of him. (R. at 273-274.)

Friends and family of the Carrenos confirmed Mr. Carreno's concerns. (R. at 177-179.) Dianna Giron ("Ms. Giron"), a close family friend, described G. as being the most troublesome of Mr. Carreno's children. (R. at 179.) Ms. Giron explained that G. ignores Mr. Carreno's directions and forgets what Mr. Carreno asks him to do. (*Id.*) Paul Medlin ("Mr. Medlin"), Mr. Carreno's nephew, confirmed Ms. Giron's observations. (R. at 178.) Mr. Medlin reported that G. often forgets what Mr. Carreno has told G. to do or does not understand how to do "simple things." (*Id.*) Another family friend, Joseph Favela, described G. as rebellious and "difficult to control." (R. at 177.)

### 3. Psychoeducational Evaluation

In order to determine how best to handle G.'s academic and behavioral needs, G. was referred for a psychoeducational evaluation. (R. at 139.) For the purposes of the evaluation, G. was observed during in-class reading time. (R. at 141.) While his teacher was reading aloud to his class, G. "had no apparent difficulty remaining on task," and even volunteered an answer to the whole class. (*Id.*) The teacher then split the class up for partner reading. (*Id.*) During this activity, G. was able to track print with his finger and summarize what he read to his partner. (*Id.*)

G. was also given a standardized test designed to measure an individual's intellectual ability. G. received an overall score of 87, which corresponds to the 19th percentile. (R. at 142.) G.'s verbal comprehension was in the 16th percentile. (*Id.*) His Perceptual Reasoning Index (a measurement of perceptual and fluid reasoning, spacial processing, and visual-motor integration) was in the 8th percentile. (*Id.*) G. struggled to complete tasks which required the use of information retained in the memory. (*Id.*) When tested in the area of memory retention, G. needed "frequent reminders as to the task demands," and he ultimately scored in the 27th percentile. (*Id.*) G.'s ability to process information was above average, at the 79th percentile (*Id.*); his ability to integrate his visual and motor abilities was within the 45th percentile (*Id.* at 143); his reading comprehension and decoding speed was measured in the 3rd percentile (*Id.*); and his ability to reason and solve math problems was in the 46th percentile. (*Id.*)

As a result of this evaluation, it was determined that G. was eligible for special education for his "Specific Learning Disability." (R.. at 144.) According to Alisa Fallon, the School Psychologist who performed the evaluation, G. "demonstrates an inability to learn which cannot be explained by intellectual, sensory, or other health factors. (*Id.*)

### 4. Expert Testimony

On November 13, 2006, a hearing took place before the ALJ, at which Dr. Edward Jasinski ("Dr. Jasinski"), a licensed Psychologist (R. at 60), provided expert testimony on the significance of the evidence in G.'s file. (R. at 259.) Dr. Jasinski was not G.'s treating

1  psychologist, nor had he personally examined G. (*Id.*) Rather, Dr. Jasinski's testimony was
2  based solely on the information ascertained from G.'s record. (*Id.*)
3      Dr. Jaskinski testified that, based on his interpretation of the psychoeducational
4  evaluation, G. suffered from a learning disability, particularly in the area of reading. (R. at
5  259-260.) Dr. Jasinski then testified that because G. was receiving special education services
6  for reading, G.'s impairment in the domain of "acquiring and using information" was
7  "marked." (R. at 261.) Dr. Jasinski also testified that G.'s impairment in the area of
8  "attending to and completing tasks" was "less than marked." (*Id.*)

### 5. ALJ's Decision

10      The ALJ concluded that G.'s limitation in the domain of "acquiring and using
11  information" was "marked." (R. at 28.) In making this finding, the ALJ acknowledged that
12  G. has a learning disability in the area of reading and, consequently, G. receives special
13  education services. (*Id.*) The ALJ also discussed the psychoeducational evaluation and the
14  fact that G. scored in the 3rd percentile in reading. (*Id.*) The ALJ further noted that G. scored
15  in the 46th percentile in math, which was in the "average range" and recognized that G.'s full
16  scale (overall measure of intellectual ability) and verbal comprehension scores - in the 19th
17  and 16th percentiles respectively - were in the "Low Average" range. (*Id.*) The ALJ then
18  considered the expert testimony of Dr. Jasinski, who testified that, based on these scores in
19  the psychoeducational evaluation, G.'s limitations should be labeled "marked." (*Id.*) The
20  ALJ agreed. (*Id.*)

21      G.'s limitation in the domain of "attending to and completing tasks," however, was
22  determined by the ALJ to be "less than marked." (*Id.*) The ALJ noted that Mr. Carreno
23  described G. as having an inability to pay attention and complete tasks. (*Id.*) Moreover, the
24  ALJ acknowledged that one of G.'s teachers reported that he needs "constant encouragement
25  to complete tasks along with repeated verbal instruction." (*Id.*) The ALJ then noted that
26  during the psychoeducational evaluation, G. was observed as having "no apparent difficulty
27  remaining on task" in the classroom, and that he "demonstrated a positive attitude and good

1 attention focus." (R. at 28-29.) The ALJ concluded that, while all of G.'s teachers have
2 reported problems in this domain, G. has no more than a "mild limitation." (R. at 29.)

## II.  STANDARD OF REVIEW

### A.  Standard for Review of ALJ's Decision

When deciding a Social Security appeal, the decision of the Commissioner must be affirmed if it is supported by substantial evidence and the Commissioner applied the correct legal standards. *See Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003). When reviewing factual determinations by the Commissioner, acting through the Administrative Law Judge, this Court affirms if substantial evidence supports the determinations. *See Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is more than a mere scintilla, but less than a preponderance. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003); *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). Substantial evidence is relevant evidence which a reasonable person might accept as adequate to support a conclusion when the entire record is considered. *Howard*, 341 F.3d at 1011; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the Court may not substitute its judgment for that of the Commissioner. *See Batson*, 359 F.3d at 1193; *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *See Benton*, 331 F.3d at 1040; *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). The ALJ's determinations of law are reviewed de novo, although deference is owed to a reasonable construction of the applicable statutes. *See Edlund*, 253 F.3d at 1156; *McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir. 2000).

### B.  Standard for Determining Child Disability

A child is considered "disabled" if the child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C.

§ 1382c(a)(3)(C)(I). A child claimant must show that (1) he or she is not working, (2) that he or she has a "severe" impairment or combination of impairments, and (3) that his or her impairment(s) meets, medically equals, or functionally equals the severity of an impairment in the Listing Impairments (discussed in 20 C.F.R. pt. 404, app. 1 subpt. P) ("Listings").

The Listings establish six domains for determining functional equivalence: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1) (2007). An impairment functionally equals that of an impairment in the Listings, if the impairment causes "marked" limitations in two of the six domains, or "extreme" limitations in one of the six domains. 20 C.F.R. § 416.926a(d).

A limitation is "marked," if it seriously impacts a child's ability to initiate, sustain, or complete activities on a daily basis. 20 C.F.R. § 416.926a(e)(2)(I). A "marked" limitation is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(I). An "extreme" limitation is "more than marked," but "does not necessarily mean a total lack or loss of ability to function." 20 C.F.R. § 416.926a(e)(3)(I).

## III. DISCUSSION

Plaintiff argues that the ALJ improperly weighed the evidence when finding that Plaintiff's impairment caused a "marked," rather than an "extreme" limitation in Plaintiff's ability to acquire and use information. In addition, Plaintiff argues that the ALJ incorrectly concluded that Plaintiff's ability to attend to and complete tasks was "less than marked," rather than "marked."

As long as there is substantial evidence supporting the ALJ's decision and the decision was not based upon incorrect legal standards, this Court must affirm the decision of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). However, this Court finds

that the ALJ's decision was *not* based on substantial evidence and that the ALJ's decision was based upon the *incorrect* legal standard.

## A. Lack Of Substantial Evidence

### 1. Acquiring and Using Information

### Expert Witness Testimony

The ALJ's decision is not supported by substantial evidence because by merely summarizing the evidence in the record, the ALJ failed to establish that Dr. Jasinski's testimony alone justified denying benefits. When the ALJ is confronted with inconsistent evidence, the ALJ must weigh "*all* of the evidence." 20 C.F.R. § 404.1527(c)(2) (emphasis added). The ALJ must "explain in the decision the weight given to the opinions of a . . . psychological consultant or other program physician or psychologist, as the [ALJ] must do for any opinions from . . . nontreating sources, and other nonexamining sources." 20 C.F.R. § 404.1527(f)(2)(ii);  *See also Magallanes v. Bowen*, 881 F.2d 747, 750 (Cal. 1989) (citing *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1987).) (To determine whether substantial evidence exists to support denying benefits, an ALJ must consider "the administrative record as a whole, *weighing* both the evidence that supports and [that which] detracts from the ALJ's conclusion.") (emphasis added).

Here, the ALJ provided no reason why Dr. Jasinski's opinion was given controlling weight, at the exclusion of all other opinions and evidence, despite the fact that Dr. Jasinski was a nonexamining psychologist. Instead of evaluating and reconciling the conflicting evidence in the record, the ALJ adopted, without explanation, the testimony of Dr. Jasinski. (R. at 28). The ALJ merely stated that "[t]he medical expert testified that the claimant had a marked limitation in this domain. The undersigned agrees and finds that in this domain, the child has 'marked' limitations." (*Id.*) Without justification, Dr. Jasinski's opinion does not constitute "substantial evidence" supporting the ALJ's decision. *Pitzer v. Sullivan*, 908

F.2d 502, 506 n. 4 (9th Cir. 1990) ("The nonexamining physicians' conclusion, with nothing more, does not constitute substantial evidence.").

**Layperson Testimony**

In addition to the fact that the ALJ failed to provide an explanation for solely adopting the opinion of Dr. Jasinski, the ALJ erred by failing to address the significance of the teacher evaluations and witness statements. Lay witnesses are often in the unique position to observe a claimant on a daily basis, and if an ALJ wishes to discount their testimony, he must articulate specific reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). In his ruling, the ALJ thoroughly summarized the opinions of G.'s teachers, each of whom had personal contact with G. on a regular basis. However, the ALJ failed to explain why their opinions were outweighed by the testimony of Dr. Jasinski, an individual who had never had any personal contact with G.

When an ALJ does not adequately consider the opinions of lay witnesses favorable to the claimant, "a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination [than the lay witness]." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006). Here, if fully credited, the teachers' testimony supports the conclusion that G.'s limitation in the domain of acquiring and using information was "extreme." Each of G.'s teachers indicated problems in this area, specifically acknowledging his difficulty with reading and writing. The ALJ's failure to articulate any reasons for discounting these evaluations does not qualify as harmless error. *Id.* When an ALJ commits error that is not harmless, the ALJ's decision is not based on substantial evidence. *Id.*

**2. Attending to and Completing Tasks**

The ALJ further failed to justify his finding that G.'s limitation in "attending to and completing tasks" was "less than marked." The ALJ is obligated to articulate some minimal

- 9 -

level of reasoning justifying his findings.  *See also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

Here, the ALJ did not set forth how the evidence led him to his decision.  Instead, the ALJ merely stated, in a conclusory manner, "there is no evidence of more than a mild limitation in this domain."  On the contrary, the record is replete with evidence of "more than a mild limitation."  For example, Ms. Turman reported that G. had a "serious problem" working without distracting himself and others, on an hourly basis.  She also reported that G. had a "serious problem" on a daily basis with completing assignments, and doing so without careless mistakes.  She also listed several other problems for which G. had an "obvious problem" on a daily basis, including (1) focusing to complete a task, (2) refocusing when necessary, (3) carrying out multi-step instructions, (4) changing activities without being disruptive, and (5) working at a reasonable pace.  Furthermore, G.'s special education teacher, Ms. Tundle, reported "obvious problems" on a daily basis in several of the aforementioned categories.  Ms. Tundle also described G. as needing "constant encouragement" to complete his schoolwork along with "repeated verbal instruction."

Despite the fact that the ALJ acknowledged G.'s inability to attend to and complete tasks, the ALJ still concluded, without explanation, that there was "no evidence," that G.'s limitation was more than mild.  If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the Court may not substitute its judgment for that of the Commissioner.  *See Batson*, 359 F.3d at 1193; *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002).  However, without the ALJ specifically articulating his reasoning, the ALJ has effectively prevented this Court from reviewing whether the ALJ's judgement was a reasonable interpretation of the evidence.

The ALJ stated that, on one occasion, G. was "observed in the classroom to have no apparent difficulty remaining on task" but again, the ALJ failed to resolve the discrepancy between this observation and the observation of G's teachers.  (R. at 28).  The ALJ did not

explain why a one-day observation by a school psychologist, outside the context of the normal learning environment, should be given more weight than the opinions of G.'s teachers who work with him on a daily basis and are uniquely positioned to evaluate his limitations. (*Id.*) There was no explanation as to why one piece of evidence was more compelling, or should be given more weight, than another competing piece of evidence. (*Id.*) The ALJ also mentioned that during the psychoeducational evaluation, G. "demonstrated a positive attitude and a good attentional focus." (*Id.*) However, the ALJ did not explain why the psychoeducational evaluation, which resulted in G.'s referral for special education and found G.'s overall intellectual performance to be within the 19th percentile, should be interpreted to mean that G.'s limitation in this area was "less than marked." (*Id.*) The ALJ must articulate some justification for such conclusions. *See Lester*, 81 F.3d at 834.

Finally, while the ALJ did acknowledge Mr. Carreno's testimony and the witness statements of friends and family of the Carrenos, he did not consider these statements in the context of "attending to and completing tasks." Rather, the ALJ discussed these statements only in the context of "interacting and relating with others." The ALJ acknowledged that G.'s father, Mr. Carreno, was a credible witness when he testified during the hearing that G. suffers from behavioral and learning problems and has difficulty following directions. These sentiments were corroborated by the written witness statements of various friends and family members. It is not clear why the ALJ discussed these statements in the context of "interacting and relating with others," rather than giving them weight within the context of "attending to and completing tasks." On its face, it would seem that G.'s inability to do things that his father asks him to do would be more relevant to the domain of "attending to and completing tasks." Perhaps the ALJ's conclusion would have been different if he had considered these statements within the context of "attending to and completing tasks." Or, perhaps the ALJ had good reason to discuss these statements only in the context of "interacting and relating with others." However, the ALJ's failure to articulate his reasons makes it impossible for the Court to understand the ALJ's decision.

For these reasons, the Court finds that the ALJ's conclusions that G's limitations in the domain of "acquiring and using information" and "attending to and completing tasks" are merely "marked" and "less than marked," respectively, are not based on substantial evidence from the record.

## B.  Incorrect Legal Standard

In addition to not justifying the weight given to Dr. Jasinski's testimony, the ALJ failed to reconcile the inconsistencies between Dr. Jasinski's testimony and the legal standard for determining a child's level of impairment.  When determining whether a child suffers from limitations, the ALJ must compare the child to other children of the same age *without impairments*.  20 C.F.R. § 416.924a(b)(3) (emphasis added).  During his testimony, in response to being asked whether G.'s reading level, in the 3rd percentile, called for a label of "extreme" limitation, Dr. Jasinski responded, "[n]o, not at all.  That's pretty standard for people with learning disability problems." (R. at 265).  Dr. Jasinski erred by comparing G.'s performance to people with learning disabilities, rather than to other children without any impairments.  Thus, the ALJ's adoption of Dr. Jasinski's opinion, without resolution of Dr. Jasinski's application of the incorrect legal standard was legal error.  20 C.F.R. § 416.924a(b)(3).

### IV.  REMAND FOR AWARD OF BENEFITS

This Court has discretion to decide whether to remand for the award of benefits, or for further administrative proceedings. *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996) (citing *Swenson v. Sullivan,* 876 F.2d 683, 689 (9th Cir. 1989)).  Generally, benefits are awarded where the record has been fully developed and where further administrative proceedings would serve no useful purpose.  *Id.*; *Ramirez v. Shalala*, 8 F.3d 1449, 1455 (9th Cir. 1993); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).  In *Smolen*, the court found it appropriate to award benefits where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's supporting] evidence, (2) there are no outstanding issues that must

> be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

8 F.3d at 1292. Here, the ALJ did not provide any reasons or explanation for rejecting the opinions of G.'s teachers, or his friends and family. Instead, the ALJ's decision was based exclusively on Dr. Jasinski's interpretation of the objective evidence on record, and Dr. Jasinski's incorrect understanding of the law. There are also no remaining issues that must be resolved by additional administrative procedures before a determination of disability can be made. Rather, the record is full of objective psychological evidence, along with reports from G.'s teachers and statements from friends and family. Remanding for further proceedings would serve no useful purpose, but would unnecessarily delay the award of benefits. In addition, allowing the ALJ "to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart,* 379 F.2d 587, 595 (9th Cir. 2004). Therefore, the decision of the ALJ is **REVERSED** and **REMANDED** for the award of benefits.

## IV. CONCLUSION

In light of the foregoing discussion, the Court finds that the ALJ erred in his disability determination.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 11), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. 14) is **DENIED.**

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly.

DATED this 3rd day of July, 2008.

_____
Stephen M. McNamee
United States District Judge

- 14 -